# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**HARRY MILLER,**                                    Case No. 1:18 CV 1079

       Plaintiff,

       v.                                    Magistrate Judge James R. Knepp II

**COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION,**

       Defendant.                          MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Plaintiff Harry Miller ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 10). For the reasons stated below, the undersigned affirms the decision of the Commissioner.

## PROCEDURAL BACKGROUND

Plaintiff filed for DIB and SSI in December 2014, alleging a disability onset date of November 12, 2014. (Tr. 214-21). His claims were denied initially and upon reconsideration. (Tr. 142-47, 151-62). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 163). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on February 1, 2017. (Tr. 29-65). On June 22, 2017, the ALJ found Plaintiff not disabled in a written decision. (Tr. 12-23). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6); *see* 20

C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. Plaintiff timely filed the instant action on May 10, 2018. (Doc. 1).

FACTUAL BACKGROUND[1]

Personal Background and Testimony

Born in 1973, Plaintiff was 41 years old on his alleged onset date, and 43 at the time of the ALJ hearing. *See* Tr. 214, 216.

At the hearing, Plaintiff testified to breathing problems, back problems, migraines, and "blackouts". (Tr. 41). He stopped driving two years prior due to these blackouts, which he stated occurred approximately four times per month. (Tr. 41-42, 45). Plaintiff testified he began using a prescribed walker within the prior six months, and used a cane before that due to back pain and to prevent falls. (Tr. 43).

Plaintiff also had breathing difficulty (asthma) which prevented him from walking far. (Tr. 46-47). He treated his breathing issues with a nebulizer, an inhaler, and sometimes steroids. (Tr. 56). He used the nebulizer twice per week; the process took about twenty minutes. (Tr. 57).

Plaintiff had back pain since 1992 after an injury while serving in the military. (Tr. 48). He had attended therapy and pain management, and was taking Percocet and ibuprofen. (Tr. 48-49). The medication reduced his pain "from . . . a ten to a four." (Tr. 49). He no longer did exercises, but in addition to medication, used ice packs, a TENS unit twice per day, and lidocaine patches twice per day. (Tr. 49-51). Plaintiff was most comfortable laying down, and did so approximately four times per day. (Tr. 49-50). Bending, stairs, standing for lengthy periods, and lifting aggravated

---

1. The undersigned summarizes only that evidence related to Plaintiff's argument, which relates to his physical, rather than mental, functioning. *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) (issues not raised in opening brief waived).

his pain. (Tr. 50). He estimated he could stand for fifteen to twenty minutes, and lift about ten to fifteen pounds. *Id.*

Plaintiff could bathe and get dressed, but his wife cooked and did the housework. (Tr. 47). He had difficulty going up and down stairs. (Tr. 47-48).

Relevant Medical Evidence

In the two months prior to his alleged onset date, Plaintiff had five emergency room visits. *See* Tr. 326-28, 387-92.

At an August 2014 visit, Plaintiff reported a history of chronic low back pain and an injury the previous day while playing football. (Tr. 325-26). His respiratory examination was normal. (Tr. 327). On examination, he had paraspinal tenderness, and providers diagnosed acute lumbar back pain and lumbar strain. (Tr. 328).

In September and October 2014, Plaintiff had three hospital admissions for shortness of breath. *See* Tr. 366-404. Examination in September revealed audible wheezing, but no respiratory distress (Tr. 402), and Plaintiff was diagnosed with bronchitis (Tr. 403). At his first visit in October, Plaintiff was admitted after emergency providers found him to be hypoxic and gave him breathing treatments. (Tr. 387). During his hospital stay, he was noted to have wheezing and some decreased breath sounds on examination. (Tr. 387, 391). A chest x-ray showed no evidence of acute infiltrative process. (Tr. 391). He was diagnosed with shortness of breath, likely secondary to asthma exacerbation and obstructive sleep apnea. (Tr. 391-92). He was treated with steroids and antibiotics, as well as breathing medications. *See* Tr. 366. Plaintiff returned a second time in October via ambulance with progressive severe shortness of breath. *Id.* Plaintiff underwent breathing treatments for a presumed asthma exacerbation. *Id.* His final diagnoses were shortness of breath, cough with sputum, abdominal pain, left upper quadrant, and bronchospasm. *Id.* During

this visit, Plaintiff also had a pain management consultation for his back pain, and his home dose of Percocet was changed. *Id.*

In early November 2014, Plaintiff underwent an initial pain management evaluation with Joseph Abdelmalak, M.D. (Tr. 407-10). Plaintiff reported low back and neck pain that started six years prior, and was aggravated by sitting, standing, forward flexion, lifting, rising from a seated position, and walking. (Tr. 407). He last attended physical therapy in 2012 and continued to perform exercises at home. (Tr. 408). Dr. Abdelmalak found tenderness over Plaintiff's lumbar spine, bilateral lumbar facets, and cervical paraspinal muscles; his straight leg raise test was negative, and he had normal motor strength, sensation, and reflexes. (Tr. 409). Dr. Abdelmalak diagnosed lumbago, cervicalgia, and back muscle spasm. *Id.* He prescribed Diclofenac and Zanaflex and referred Plaintiff to physical therapy. *Id.*

Plaintiff returned to the emergency room later in November 2014 for back pain. (Tr. 535-37). He reported the pain (which he rated as ten out of ten) started three days prior when he was moving furniture. (Tr. 535). His respiratory examination was normal. (Tr. 536). He had moderate diffuse tenderness in his lumbar spine, but normal range of motion and strength. *Id.* Upon re-examination after medication, he reported the pain decreased to three out of ten. *Id.* The provider diagnosed lumbosacral back pain and prescribed Anaprox, Percocet, and cyclobenzaprine (for muscle spasms). (Tr. 536-37).

In December 2014, Plaintiff returned to the emergency room complaining of shortness of breath and syncope. (Tr. 538). He reported multiple episodes where he collapsed in the prior three months. *Id.* On examination he had regular respirations but there were crackles present. (Tr. 539). His musculoskeletal examination was normal. *Id.* He was "feeling better after neb[ulizer] treatment

but [had] [shortness of breath] when up and walking and wheezing again", so he was admitted. (Tr. 540).

Plaintiff had another visit later that month for aggravation of his lumbar pain. (Tr. 777). His back examination revealed full range of motion, no tenderness, palpable spasm, or pain on motion. (Tr. 778). He was prescribed medication, and diagnosed with spinal stenosis of the lumbar region and chronic back pain. *Id.* The provider also noted "[e]ncounter for long-term opiate analgesic use." *Id.* During this visit, Phillip Demio, M.D. noted: "Pt w many worrisome findings on OARRS check, PCP declined further opiates & sent to PM which the pt reportedly has not done." *Id.* The following month – January 2015 – Plaintiff returned to the emergency room with low back pain after he "[t]wisted . . . while shoveling snow." (Tr. 567). His review of systems was negative for apnea, cough, and shortness of breath (Tr. 569) and his respiratory examination was normal (Tr. 570). On musculoskeletal examination, Plaintiff had left lumbar paraspinal tenderness, and increased pain with bending forward, but a normal gait, normal straight leg raising, normal reflexes and motor strength, and was able to toe/heel walk and squat. (Tr. 570). He was diagnosed with an acute exacerbation of chronic low back pain and prescribed "a short course" of Percocet. (Tr. 571). "He was advised that he could not come to the ER for more Percocet and that he must call his PCP tomorrow for follow up." *Id.*

In February 2015, Plaintiff underwent a consultative examination with Khalid Darr, M.D. (Tr. 576). He reported a history lower back problems, which he had treated with epidural blocks, physical therapy, and pain medication. *Id.* He described that "off and on he still gets pain in the lower back with prolonged standing, walking, bending, pulling and pushing." *Id.* Plaintiff also reported his recent history of breathing problems and diagnosis of chronic obstructive pulmonary disease ("COPD"), as well as complained of migraine headaches. *Id.* On examination, Dr. Darr

noted Plaintiff had a normal gait, did not require the use of an assistive device, and "appear[ed] stable at station and comfortable in the supine and sitting positions." (Tr. 577). His pulmonary examination was normal. (Tr. 578). He had what Dr. Darr described as "a normal physical examination". (Tr. 579). Specifically, Dr. Darr noted Plaintiff had normal curvature of the dorsolumbar spine, no muscle spasm, no tenderness, normal straight leg raising, and he was able to stand on one leg at a time "without difficulty". *Id.*

Plaintiff was again seen in the emergency room in February 2015 for shortness of breath and wheezing for the prior three days. (Tr. 626). He reportedly ran out of both his nebulizing solution and his Advair inhaler and on examination, he had bilateral wheezing and decreased air entry. (Tr. 626-27). On musculoskeletal examination, he had no joint tenderness, deformity or swelling. *Id.* Review of systems notes indicate: "Patient has chronic back pain. He feels better today." (Tr. 628). A chest x-ray during this visit revealed "brochovascular prominence consistent with bronchitis". (Tr. 639). On discharge, Plaintiff was diagnosed with COPD versus asthma exacerbation. (Tr. 631). The emergency room physician wrote prescriptions for Advair, albuterol, and albuterol solution for his home nebulizer, as well as steroids. *Id.* The physician also prescribed Percocet; which he noted "apparently patient uses chronically" and that "vigilance for drug seeking behavior would be prudent." *Id.*

In early March 2015, Plaintiff saw Felix Nwaokafor, M.D., for follow-up from his latest emergency room visit. (Tr. 668-80). On examination he had wheezes bilaterally. (Tr. 673). Dr. Nwaokafor prescribed medication (Lodine and Robaxin, and Percocet), ordered lumbar x-rays, diagnosed chronic low-back pain, gave Plaintiff home exercises, and referred him to a pain clinic. (Tr. 671-75). The lumbar x-ray revealed "no signs of compression or subluxation" and well maintained disc spaces with "some endplate spurring." (Tr. 751).

In April, Plaintiff went to the emergency room again with breathing difficulties. (Tr. 685-741). He was wheezing on examination, was in respiratory distress, and his chest x-ray was unremarkable. (Tr. 688). He had decreased range of motion and tenderness in his cervical and lumbar spine, but normal lower extremity strength and negative straight leg raises. *Id*. The provider noted Plaintiff had received a pulmonary referral in February but did not follow through. (Tr. 690). Plaintiff was counseled about the need to switch from Percocet to long-acting pain medication, and was given the lowest possible equivalent dose of a Fentanyl patch. *Id.*; *see also* Tr. 709 (discharge instructions). Plaintiff was referred to an ENT and for a pulmonary consultation. (Tr. 690). He was diagnosed with bronchitis, wheezing, low back pain, dyspnea and respiratory abnormalities, history of syncope, long term current usage of opiate analgesic, chronic pain, opioid dependence, and reactive airway disease with acute exacerbation. *Id.*

Plaintiff again returned to Dr. Nwaokafor for follow-up. (Tr. 742-47). Plaintiff "ask[ed] for pain meds", reporting the Fentanyl did not help and made him "goofy". (Tr. 746). On examination he had "bilateral coarse wheezes all over." *Id.* Dr. Nwaokafor assessed bronchitis and instructed Plaintiff to follow up with a pulmonary specialist and an ENT; he also assessed lumbar spinal stenosis and instructed Plaintiff to follow up with pain management. *Id.* Dr. Nwaokafor prescribed Tramadol and instructed Plaintiff to return in six months. (Tr. 747).

Plaintiff had another emergency room visit and hospital admission in April 2015 for a COPD exacerbation. (Tr. 758). On examination, he had labored respirations, coarse rhonchi, a prolonged expiratory phase, but no wheezing. (Tr. 761). He also had normal range of motion and normal strength on musculoskeletal examination. (Tr. 756). He was given breathing treatments and intravenous steroids. (Tr 758). The physician assessed acute COPD exacerbation, reactive

airway dysfunction syndrome, lumbar spondylosis, and osteoarthritis. (Tr. 761). On discharge two days later, Plaintiff had nonlabored respirations with no wheezing or rhonchi. (Tr. 763).

In May 2015, Plaintiff saw pain management physician Roger Goomber, M.D. (Tr. 999-1003). Plaintiff reported constant low back and neck pain since a car accident two years prior. (Tr. 999). Dr. Goomber noted Plaintiff underwent lumbar facet injections in 2010 "which provided 4 days of good relief and then his symptoms got worse and he was medically managed." *Id*. Dr. Goomber reviewed the 2015 lumbar spine x-ray which showed no signs of compression or subluxation and that disc spaces were well maintained, with some endplate spurring and a 2010 MRI which showed mild spinal canal and mild bilateral neural foraminal stenosis at L4/5 and mild bilateral neural foraminal stenosis at L5/S1. (Tr. 1001-02); *see also* Tr. 1003 ("There is minimal facet arthritis and little to no disc degeneration."). Dr. Goomber noted that these provided "little evidence to support the need for opiates to manage his pain." (Tr. 1003). On examination Plaintiff had a normal gait, no muscle atrophy, no subluxation, normal strength, and normal range of motion. (Tr. 1002). Dr. Goomber noted diagnoses of lumbar spondylosis, lumbar foraminal stenosis, chronic low back pain, and long-term current use of opiate analgesic. *Id.* Dr. Goomber recommended physical therapy, but Plaintiff declined to attend due to his COPD; Dr. Goomber reviewed home exercises. (Tr. 1002-03). Plaintiff also was "not interested in any interventional injection therapy", so Dr. Goomber referred him to Comprehensive Pain Management. (Tr. 1003).

Plaintiff saw Dr. Nwaokafor again in June 2015 to "[d]iscuss [m]edications". (Tr. 922). Dr. Nwaokafor noted Plaintiff "[g]ets pain pills that help his pain, but was evaluated by Dr. Goomber 2 weeks ago but [patient] declined any form of procedural intervention." (Tr. 927). On pulmonary examination, Dr. Nwaokafor noted "coarse bilateral rhonc[h]i." *Id.* There are no physical

examination findings. *See id.* He assessed low back pain and spinal stenosis of the lumbar region, for which he prescribed Percocet. *Id.*

The following month, Plaintiff returned to the emergency room with chronic back pain and a syncopal episode. (Tr. 1033). Specifically, he reported walking for "hours" that afternoon and passing out. *Id.* He told another provider he was outside in the sun for three to four hours and walked the dog; he felt dizzy and short of breath when he passed out. (Tr. 1026). He had unlabored respirations and his lungs were clear to auscultation bilaterally (Tr. 1033), and he was noted to have normal breath sounds, no respiratory distress, and no wheezes (Tr. 1027). Plaintiff told a nurse he wanted a prescription for pain medication, and noted he was concerned about pain control after discharge. (Tr. 1028). An emergency room provider made Plaintiff an appointment with Dr. Nwaokafor for the following day. *Id.* On discharge he denied any shortness of breath, complained of neck and back pain which he rated as six out of ten, and "was ambulatory out of unit with steady gait, no facial grimacing or guarding areas of pain." *Id.*

In early August 2015, Plaintiff saw Dr. Nwaokafor to discuss his pain. (Tr. 1122, 1128). Dr. Nwaokafor noted Plaintiff "[w]as referred to CPMS but has missed 2 appointments" and that he requested a medication refill. (Tr. 1128). He also noted Plaintiff had longstanding COPD but had not been evaluated at that facility. *Id.* On examination, Plaintiff had a normal pulmonary examination; there were no musculoskeletal findings. *Id.* Dr. Nwaokafor assessed bronchitis ("[n]o acute exacerbation at this time") and COPD exacerbation, for which he referred Plaintiff to pulmonology. *Id.* He also assessed lumbar spinal stenosis, and chronic back pain, for which he prescribed Percocet, but "[e]mphasized no refill if he misse[d] the next [CPMS] appointment". *Id.* That same month, Plaintiff underwent a pulmonary function test, which showed normal lung volumes, and normal diffusing capacity, but reduced forced expiratory flow. (Tr. 1138). The

physician concluded the test was compatible with a clinical diagnosis of mild airflow slowing of small airways and noted that post-bronchodilator some findings improved "suggesting reversible airflow obstruction." *Id.*

In September 2015, Plaintiff saw William Schwab, M.D. (Tr. 1156-64). Plaintiff reported lower back and neck pain with a duration of 23 years, which he attributed to an injury during military service. (Tr. 1156). He reported his pain was mild on Percocet, but was constant and increased with activity, jerky movement, and long car rides. *Id.* The pain improved with a TENS unit, Icy Hot, and exercise. *Id.* On examination, Dr. Schwab noted Plaintiff was able to rise/sit with arms crossed "slowly", had a "stiff trunk" with his gait, and was able to "stiffly" pick a pen off the floor. (Tr. 1157). He also had pain to palpation of the midline sacrum. *Id.* Dr. Schwab renewed Plaintiff's Percocet, instructing him to take it three times per day, along with ibuprofen. (Tr. 1163).

Plaintiff also underwent a pulmonary consultation with Andre Smith, M.D. in September 2015. (Tr. 1174-78). On examination, Dr. Smith noted Plaintiff's chest was clear, and he had normal symmetric air entry throughout both lung fields. (Tr. 1176). A stress test the prior month showed occasional PVCs, no ST changes, and a normal heart rate and blood pressure response to exercise. (Tr. 1177). However, Plaintiff did not reach the target heart rate due to shortness of breath and lightheadedness, and he had below-average aerobic activity for his age. *Id.* Dr. Smith assessed moderate persistent asthma without complication, and prescribed medication. *Id.* He also assessed a sleep disorder and referred Plaintiff for a sleep study. (Tr. 1177-78).

Plaintiff returned to the emergency room in March 2016 with a headache, blurred vision and neck pain after an altercation. (Tr. 1206). His neck pain extended into his right upper back; he also noted chronic back pain issues for which he took Percocet. (Tr. 1207). Plaintiff's respiratory

examination was normal. (Tr. 1208). On musculoskeletal examination, he had diffuse cervical spine bony tenderness, and right cervical paraspinal tenderness. *Id*. He had normal strength, range of motion, and sensation. *Id*. He was ambulatory with a steady gait. (Tr. 1209).

In April 2016, Plaintiff saw Dr. Nwaokafor, who had switched practices. (Tr. 1315). He sought to establish care and refill pain medication. *Id*. He reported back pain but no difficulty walking. *Id*. Plaintiff had a normal pulmonary evaluation and on musculoskeletal examination, his gait was normal. (Tr. 1316). Dr. Nwaokafor assessed chronic low back pain, referred Plaintiff to pain management, and refilled his medication. (Tr. 1317).

On June 23, 2016, Plaintiff saw Dr. Nwaokafor again for medication refills. (Tr. 1307). He reported missing a pain management appointment because his father passed away, and requested a refill of medication to make it to his next appointment. *Id*. He had a normal pulmonary examination and there were no musculoskeletal examination findings. (Tr. 1309). Dr. Nwaokafor assessed chronic low back pain, refilled pain medications[2], instructed Plaintiff to keep his pain management appointment, and noted he would "not refill the medications without that appointment." (Tr. 1309-10).

On July 7, 2016, Plaintiff returned to the emergency room reporting lower back pain for two days after helping his daughter move. (Tr. 1280). He stated he "twisted and hurt [his] back more". *Id*. He reported he had run out of Percocet, and needed some more until his appointment in three to four days; he was taking Motrin for pain "without much relief." *Id*. Plaintiff had a normal pulmonary examination, normal gait, and full strength in his upper and lower extremities. (Tr. 1281). He was given Percocet for pain. *Id*. A review of OARRS stated "Other concerning data: pt

2. Dr. Nwaokafor prescribed 90 Percocet to be taken once every eight hours as needed; he noted this to be a 30-day supply. (Tr. 1310-11).

recently had Percocet refilled on 6/23/2016 for 90 tabs for 30 days." (Tr. 1282). He was started on Voltaren and instructed to follow up with his spine doctor as scheduled. *Id.*

In August 2016, Plaintiff went to the emergency room with lower back pain, reporting he fell the day prior after a dizzy spell, hitting his lower back on the floor. (Tr. 1401). He walked "without difficulty". *Id.* On examination, Plaintiff had full range of motion, no bony tenderness, no radiculopathy, and no neuro-focal deficits. (Tr. 1403). He had tenderness to palpation in the lumbar paraspinal region bilaterally, as well as swelling and redness, but full strength in his lower extremities. *Id.* A lumbar spine x-ray revealed no acute fracture or dislocation, but mild degenerative disc disease and an indeterminate calcification projecting over the right hemiabdomen. (Tr. 1404). During his visit, Plaintiff was given Dilaudid, morphine, prednisone, and a cane. (Tr. 1403). He was discharged with an assessment of lumbar contusion. *Id.*

Plaintiff returned to the emergency room two days later with shortness of breath, cough, and syncope; the power was out and he was unable to use his nebulizer or CPAP machine. (Tr. 1389). On examination, his lungs were clear with no rales, and no respiratory distress; however, Plaintiff did have mild bibasilar wheezing. (Tr. 1390). He was noted to have full range of motion in all four extremities. *Id.* Plaintiff was given breathing treatments, and morphine for pain. *Id.*

In September 2016, Plaintiff called a physician reporting having passed out recently and requested a prescription for a wheelchair. (Tr. 1421). The physician explained that it was "not appropriate for me to prescribe a wheelchair for headache or likely cardiological symptoms." *Id.* That same month, a physician noted a primary encounter diagnosis of long-term current use of opiate analgesic, and prescribed a walker for chronic low back pain. *Id.*

*Opinion Evidence*

After his February 2015 consultative examination, Dr. Darr opined Plaintiff's upper extremity functions were intact; he did not require an ambulatory aid; he was able to push and pull as well as manipulate objects; he could operate hand and foot controls; he could drive and travel "without any difficulty"; and he could climb stairs. (Tr. 580). Dr. Darr also opined Plaintiff was able to lift and carry between 30 and 40 pounds frequently and over 40 pounds occasionally. *Id.*

Also in February 2015, State agency reviewing physician Diane Manos, M.D., reviewed Plaintiff's records and opined he could perform the lifting, carrying, sitting, standing, and walking requirements of medium work[3].

In November 2015, Dr. Nwaokafor offered an opinion regarding Plaintiff's functional abilities. (Tr. 991-92). He opined Plaintiff could lift twenty pounds occasionally[4], and ten pounds frequently[5]. (Tr 991). He opined Plaintiff could stand/walk for about four hours in an eight-hour day, and sit for about six. *Id.* He noted Plaintiff needed to alternate positions, and could sit for one hour before needing to move, and stand for thirty minutes. *Id.* He opined Plaintiff needed to shift positions at will, but would not need to lie down during a work shift. *Id.* As the medical findings to support these restrictions, he cited chronic low back pain due to lumbar stenosis. (Tr. 992). He opined Plaintiff had no limitation in reaching or manipulation, but could only push/pull occasionally due to chronic low back pain. *Id.* Finally, Dr. Nwaokafor opined Plaintiff would miss work two to three times per month due to his impairments or treatment *Id.*

---

3. The regulations defined medium work as the ability to lift no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. 20 C.F.R. §§ 416.967(c), 404.1567(c). A full range of medium work requires standing or walking, off and on, for a total of approximately six hours in an eight-hour workday. SSR 83-10, 1983 WL 31251, at *6.
4. The form defined "occasional" as "no more than 1/3 of an 8 hr day". (Tr. 991).
5. The form defined "frequent" as "1/3 to 2/3 of an 8 hr day." (Tr. 991).

## VE Testimony

The ALJ asked the VE to consider a hypothetical individual with Plaintiff's age, education, work experience, and residual functional capacity ("RFC") as ultimately determined by the ALJ. (Tr. 59-60). The VE responded that such an individual could perform jobs such as stock selector, laundry worker, and wire worker. (Tr. 60-61).

## ALJ Decision

In her June 22, 2017 written decision, the ALJ found Plaintiff met the insured status requirements for DIB through December 31, 2018, and had not engaged in substantial gainful activity since his alleged onset date of November 12, 2014. (Tr. 14). She found he had severe impairments of obesity, spine disorders, COPD, migraines, affective disorders, and anxiety disorders (Tr. 14), but that none of these impairments (singly or in combination) met or medically equaled the severity of a listed impairment (Tr. 15). The ALJ then set forth Plaintiff's physical RFC:

> [T]he claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except [he] can climb ramps and stairs frequently but never climb ladders, ropes, or scaffolds. The claimant can frequently stoop and crawl. The claimant must avoid concentrated exposure to extremes of cold and heat, humidity, noise, fumes, odors, dusts, gases, and poor ventilation.

(Tr. 17).[6] The ALJ found that based on Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that he could perform. (Tr. 22). Therefore, she found Plaintiff not disabled. (Tr. 23).

---

6. The RFC also included mental limitations which are not at issue in this case. *See* Tr. 17.

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) & 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1.      Was claimant engaged in a substantial gainful activity?

2.      Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.      Does the severe impairment meet one of the listed impairments?

4.      What is claimant's residual functional capacity and can claimant perform past relevant work?

5.      Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

### DISCUSSION

Plaintiff argues the ALJ erred in not providing sufficiently "good reasons" for discounting the opinion of his treating physician, Dr. Nwaokafor. For the reasons discussed below, the undersigned finds no error and affirms the Commissioner's determination.

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188.[7] A treating physician's opinion is given "controlling

---

7. Although recent revisions to the CFR have changed the rules regarding evaluation of treating physician opinions, such changes apply to claims filed after March 27, 2017, and do not apply to claims filed prior to that date. *See* Social Sec. Admin., *Revisions to Rules Regarding the Evaluation*

weight" if it is supported by (1) medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004). The requirement to give controlling weight to a treating source is presumptive; if the ALJ decides not to do so, she must provide evidentiary support for such a finding. *Id.* at 546; *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 376-77 (6th Cir. 2013). When the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

"Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (quoting SSR 96-2p, 1996 WL 374188, at *4). When determining weight and articulating good reasons, the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin*., 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an "exhaustive factor-by-factor analysis" to satisfy the requirement. *See Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011). A conclusory statement that a treating physician's opinion is inconsistent with the record is insufficient to satisfy the rule. *See Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010).

---

*of Medical Evidence*, 82 Fed. Reg. 5852-53, 2017 WL 168819. Plaintiff filed his claim in December 2014 and thus the previous regulations apply.

The ALJ in this case explained her consideration of Dr. Nwaokafor's opinion:

> The undersigned has given partial weight to the medical source statement executed by Felix Nwaokafor MD. (13F)[.] Dr. Nwaokafor's opinion that the claimant can generally perform light work is not supported by his own progress notes. However, there is no evidence that the claimant would need to be absent from work for two to three days a month (3F/12; 4F/8; 9F/24; 10F/4; 11F/7; 14F/10, 30, 146, 155; 16F/10; 19F/4)[.] Dr. Nwaokafor did not provide a basis for this aspect of his opinion and it is not supported by the medical record, which indicates that the claimant has received only conservative treatment for his chronic back pain.

(Tr. 21). The ALJ thus provided three substantially supported reasons for discounting Dr. Nwaokafor's opinions.

First, he noted Dr. Nwaokafor's opinion was "not supported by his own progress notes." *Id.* This is substantially supported, as Dr. Nwaokafor's treatment notes do not have significant clinical findings, but rather generally continue diagnoses and prescribe medication. *See* Tr. 668-80, 746-47, 927, 1128, 1309 (listing diagnoses of, e.g., chronic low back pain, lumbar spinal stenosis, without any noted findings regarding an examination of Plaintiff's back); *see also* Tr. 1316-17 (noting normal gait, but no other musculoskeletal findings and assessing chronic low back pain). The supportability of a physician's opinion is one factor to be considered when assigning weight and delineating good reasons. 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.").

Second, the ALJ noted that there was "no evidence that the claimant would need to be absent from work for two to three days a month." (Tr. 21). In support, she cited several records and noted that Dr. Nwaokafor did not provide a basis for this aspect of his opinion. *Id.* (citing Tr. 539, 567, 626, 756, 778, 1002, 1022, 1138, 1147, 1316, 1422). The undersigned also finds this conclusion supported. Again, the supportability of a physician's opinion is one factor to be considered when assigning weight and delineating good reasons. 20 C.F.R. §§ 404.1527(c)(3),

416.927(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion."). Additionally, the consistency of the opinion with the record as a whole is a factor to be considered. 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion.")

In response to a question about how often Plaintiff's impairments or treatment would cause him to miss work, Dr. Nwaokafor circled "2-3xs/ month", but provided no further explanation. *See* Tr. 992. Lack of explanation is valid reason to discount a treating physician's opinion, and the Sixth Circuit has explained that ALJs are not bound by conclusory statements of physicians. *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (citing *Cohen v. Sec'y of Health & Human Servs.*, 964 F.2d 524, 528 (6th Cir. 1992) (ALJ "is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation")); *see also Ellars v. Comm'r of Soc. Sec.*, 647 F. App'x. 563, 566 (6th Cir. 2016) ("Many courts have cast doubt on the usefulness of these forms and agree that administrative law judges may properly give little weight to a treating physician's 'check-off form' of functional limitations that 'did not cite clinical test results, observations, or other objective findings. . . .' ") (quoting *Teague v. Astrue*, 638 F.3d 611, 616 (8th Cir. 2011)); *Price v. Comm'r of Soc. Sec.*, 342 F. App'x 172, 176 (6th Cir. 2009) ("Because [the treating physician] failed to identify objective medical findings to support his opinion [on a questionnaire] regarding [the claimant's] impairments, the ALJ did not err in discounting his opinion."); *Hyson v. Comm'r of Soc. Sec.*, 2013 WL 2456378, *14 (N.D. Ohio) (listing cases rejecting conclusory, or check box, opinions).

Moreover, many of the records cited by the ALJ contain various normal or mild findings. *See, e.g.,* Tr. 539 (December 2014 emergency room visit with normal musculoskeletal examination

– "[n]ormal ROM, normal strength"); Tr. 567 (January 2015 emergency room visit for back pain after shoveling snow; same examination revealed no tenderness, no pain on straight leg raise, normal gait, ability to toe/heel walk and squat, and full motor strength, but increased pain when bending forward to touch toes, *see* Tr. 568); Tr. 626 (February 2015 emergency room visit for breathing problems; musculoskeletal examination at visit was normal– "no joint tenderness, deformity or swelling", Tr. 627, and that Plaintiff has chronic back pain but "feels better today", Tr. 628); Tr. 756 (April 2015 emergency room visit with normal musculoskeletal examination – "normal ROM, normal strength"); Tr. 778 (December 2014 emergency room visit with normal back exam: "no tenderness, palpable spasm or pain on motion"; at visit Plaintiff was "able to get up and ambulate without any difficulty", Tr. 779); Tr. 1002 (May 2015 musculoskeletal examination showing normal gait, full lower extremity strength, and normal range of motion; this same record states: "I see little evidence to support the need for opiates to manage his pain", Tr. 1003), Tr. 1022 (July 2015 emergency room visit for "severe" lower back pain after being passing out; was outside in the sun for three to four hours "and also walked the dog"; elsewhere this record says he walked "for hours", Tr. 1033; a musculoskeletal examination showed normal range of motion, but also tenderness, Tr. 1027, and he was "ambulatory out of unit with steady gait, no facial grimacing or guarding areas of pain.", Tr. 1028); Tr. 1316 (April 2016 visit with Dr. Nwaokafor where the only musculoskeletal finding is a normal gait).[8] Although the ALJ certainly could have been clearer and provided some further explanation for the cited treatment notes, she did so when these notes were cited elsewhere in her opinion. *See, e.g.,* Tr. 19 (noting an emergency room visit for low back pain with a normal musculoskeletal examination and that Plaintiff "was in

---

8. The ALJ also cited records showing the results of Plaintiff's August 2015 spirometry results (Tr. 1138), August 2015 treadmill stress test (Tr. 1147), and visit regarding migraines and syncopal episodes (Tr. 1422).

no distress and was able to get up and ambulate without any difficulty) (citing Tr. 778-79); Tr. 20 (noting Plaintiff had a normal gait and normal musculoskeletal examination and that a physician opined there was little evidence to support the need for opiates to manage Plaintiff's pain) (citing Tr. 1002-03). Further, in her introduction to the opinion evidence, the ALJ explained:

> He has undergone multiple normal physical examinations and been noted as not requiring an assistive device. [citing Tr. 539, 577-78, 756, 778, 1002, 1316, 1422]. He has undergone normal chest x-rays. [citing Tr. 539-40, 758]. He has also had some noncompliance issues with his COPD medications and pain management. [citing Tr. 626, 7778]. Despite his allegation of chronic pain and blackouts, he has shoveled show and took his dog walking in the sun. [citing Tr. 567, 1022]. Furthermore, he has been denied opiates for back pain. [citing Tr. 778, 1003].

(Tr. 20-21). Within this context, where the ALJ cited many of the same records with explanation two paragraphs prior, the undersigned finds the ALJ's citation thereto to discount Dr. Nwaokafor's opinion that Plaintiff would miss work two to three times per month is a substantially supported reason.

Third, the ALJ noted Dr. Nwaokafor's opinion regarding absenteeism was "not supported by the medical record, which indicates that the claimant has received only conservative treatment for his chronic back pain." (Tr. 21). In support of the restrictions opined, Dr. Nwaokafor only cited Plaintiff's back problems. Treatment for Plaintiff's back pain consisted of pain medication, home exercises, and a TENS unit. *See* Tr. 48-49. The ALJ reasonably found this level of treatment to be "conservative" and thus inconsistent with Dr. Nwaokafor's absenteeism opinion. *See Hauser v. Comm'r of Soc. Sec.*, 2014 WL 48554, at *9 (S.D. Ohio) ("In terms of medical care, it is proper to classify taking prescription medications and receiving injections as 'conservative' treatment."); *see also Labit v. Comm'r of Soc. Sec.*, 2018 WL 563837, at *11 (E.D. Tenn.) (finding ALJ's classification of use of methadone, Oxycodone, and Soma for back pain as "conservative" reasonable); *Dinkins v. Comm'r of Soc. Sec.*, 2014 WL 1270587, at *11 (N.D. Ohio) (classifying

as "conservative" treatment measures including narcotic pain relievers, anti-inflammatory medications, and neurological medications); *Cordell v. Astrue*, 2010 WL 446944, at *7, 12, 15 (E.D. Tenn.) (narcotic pain medication such as Percocet and psychotropic medications are "conservative treatment").

In part, Plaintiff argues he "has a history of migraine headaches which occur on average 9 to 10 times per month, making sustaining gainful employment impossible" and "has necessitated numerous emergency room visits for his COPD, again which affects sustaining and which supports Dr. Nwaokafor's opinion". (Doc. 12, at 14). But Dr. Nwaokafor only cited Plaintiff's back impairment as the basis for his opinion, not COPD or migraines, and in fact did not cite anything specific relative to the absenteeism opinion. (Tr. 951-52). As an out-of-circuit district court in Indiana persuasively explained in a similar situation:

> Nonetheless, Reeder argues that she had numerous conditions that produce pain which were exacerbated by her obesity, for which pain relief treatment had been problematic, and which would affect her ability to sit, stand, and walk such that Dr. Lane could conclude that she would need to take a few days off during the month to control this pain. (Reply 2.) The problem with this argument, however, is that Dr. Lane never said that Reeder would miss work more than four days per month to control her pain; rather, Dr. Lane provided *no basis or explanation whatsoever* for this high rate of absenteeism or why Reeder would to need to miss work, which is exactly why the ALJ rejected the opinion. For the ALJ to make such an assumption—that the basis for Dr. Lane's conclusion that Reeder would miss more than four days of work per month was that Reeder would have to take days off to control her pain—would amount to the ALJ substituting his judgment for that of Dr. Lane, which is impermissible. Therefore, the ALJ's rejection of Dr. Lane's unexplained opinion regarding Reeder's absenteeism is supported by substantial evidence and does not warrant a remand.

*Reeder v. Astrue*, 2012 WL 928738, at *14 (N.D. Ind) (emphasis in original) (internal citation omitted).

Thus, the undersigned finds that the ALJ's reliance on the unsupported nature of Dr. Nwaokafor's absenteeism opinion, citation to evidence of milder findings in the record, and conservative nature of Plaintiff's treatment combined suffice to provide good reasons to discount

that opinion. Plaintiff sees the evidence differently, and points to evidence suggesting he is more limited. But this Court must affirm even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. It does so here.

<h3 style="text-align:center">CONCLUSION</h3>

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB and SSI supported by substantial evidence and affirms that decision.

 s/James R. Knepp II
United States Magistrate Judge